Brooks *v.* Cooper.

THOMAS R. BROOKS and AARON W. HAND, trading as Brooks & Hand, appellants,

*v.*

ALFRED COOPER, respondent.

1. C. and H., each being the owner of a newspaper belonging to the same leading political party in a county in which, under and by virtue of an act of the legislature, entitled "A supplement to an act entitled 'An act relative to

the publication of the laws of this state in the newspapers,'" approved May 16th, 1889 (*P. L. of 1889 p. 462*), the governor, secretary of state and comptroller, or the majority of them, were the public body by virtue of the act, empowered to select in such county only one newspaper belonging to such political party, having reference in such selection "to the paper having the larger circulation," agreed in writing that in order to allay and stop the antagonism and rivalry existing between them, in their efforts to obtain the selection and business of publishing the laws of the state for their respective newspapers, that for and during a term of two years, in case of the designation of either paper to publish the laws, the net amount received for this service, after paying the expenses of the publication, should be equally divided between the two newspapers, and that their newspapers for and during said two years should be alternately selected and designated for the purpose of publishing the laws.—*Held*, that the agreement contravened the provisions of the statute referred to, vesting the authority and power of such selection in the governor, secretary of state and comptroller, and was contrary to the policy of the statute which required the publication of the laws in the newspaper having the larger circulation in such county, and thus was contrary to sound public policy and void.

2. The court will not aid in the enforcement of an illegal contract, but will leave the parties to it where it finds them.

On an appeal from a decree in *Cooper* v. *Brooks*, advised by Vice-Chancellor Pitney.

*Mr. James M. E. Hildreth* and *Mr. Herbert W. Edmunds*, for the appellants.

*Mr. Morgan Hand*, for the respondent.

The opinion of the court was delivered by

LIPPINCOTT, J.

By an act of the legislature of this state, entitled "An act relative to the publication of the laws of this state in the newspapers," approved May 6th, 1887 (*P. L. of 1887 p. 260*), it is provided in section 2:

"That the governor and comptroller shall, within ten days after this act shall become a law, and thereafter annually, within thirty days after the day fixed in January for the convening of the legislature, select and designate the newspapers to publish the laws upon the following basis: 1. To select as

Brooks v. Cooper.

many in each county as there are representatives from that county in both branches of the legislature not exceeding six, such selection to be of an equal number of newspapers representing each of the two leading political parties, having reference also to such of them as have the larger circulation."

In 1889 a supplement to the act of 1887, above cited, was enacted, approved May 16th, 1889 (*P. L. of 1889 p. 462*), by which section 2 was amended to read as follows, viz.:

"That the governor, comptroller and secretary of state, or a majority of them, shall, within ten days after this shall become a law, and thereafter annually within thirty days after the day fixed in January for the convening of the legislature, select and designate the newspapers to publish the laws upon the following basis: 1. To select as many in each county as there are representatives from that county in both branches of the legislature not exceeding eight, such selection to be of an equal number of newspapers representing each of the two leading political parties, having reference also to such of them as have the larger circulation."

On March 8th, in the year 1890, the appellants and respondent entered into a written agreement as follows, viz.:

"AGREEMENT.

"It is hereby agreed, between Alfred Cooper, publisher of the 'Gazette,' at Cape May Court House, N. J., and Aaron W. Hand, one of the publishers of the 'Star of the Cape,' newspaper, at Cape May City, N. J., and representing his firm, that there shall be no antagonism between them in their efforts to obtain the business of the publication of the laws of the state for their respective newspapers during the present term of State Senator Walter F. Leaming, but that in case of the designation of either paper to publish the laws the net amount received for this service, after paying the expenses of the said publication, shall be equally divided between the two newspapers. It is also agreed, between the parties aforesaid, that the 'Star of the Cape' shall be designated to publish said laws for the year 1890, and that the 'Gazette' shall be designated for this purpose in the year 1891.

"Signed,     ALFRED COOPER,
AARON W. HAND."

By the bill, answer and proofs, it appears that in the county of Cape May there was but one member of the legislature in each branch thereof—a senator and one assemblyman—and, therefore, the governor, comptroller and secretary of state, comprising the body having the selection, could only select one news-

paper of each of the leading political parties in the county of Cape May. It appears, after this agreement was made, the "Star of the Cape" was selected and designated as the newspaper representing one of the leading political parties, to publish the laws of this state for the year 1890, at the rates of compensation fixed for such publication. The selection and designation and rates were made and fixed under the act of 1889. It also appears that the agreement above referred to was complied with by the appellants and respondent, and the net profits of the publication for that year were divided between them.

By the bill of complaint it is alleged that, under this agreement, the appellants published the laws for the year 1890, and thereby acquired the distinction and prestige of such publication which the respondent claims is of value and benefit to the newspapers selected and the proprietors thereof, and received the compensation therefor. The expenses of the said publication for that year were submitted to the respondent and approved by him, and the one-half part of the net profits of such publication was by the appellants paid to the respondent according to the agreement.

The appellants and respondent both allege in substance that their respective newspapers had the larger circulation in the county. The respondent alleges that there was an unsettled dispute in relation to the question which had the larger circulation, the "Star of the Cape," belonging to the appellants, or the "Gazette," belonging to the respondent.

It further appears by the bill, answer and proofs that the respondent was very anxious, in accordance with the terms of the agreement, to secure for the "Gazette" the publication of the laws for the year 1891, but because of some difficulties, fancied or otherwise, which had arisen since the making of the agreement, or had existed previously between himself and some one or more members of the body empowered by law to make the selection, he became convinced that he could not succeed in having his paper selected for that purpose; and that it was further agreed, between appellants and respondent, that the respondent should make no effort to have his newspaper so selected for

that year; that he would forego the distinction and prestige of such publication in his newspaper and make no opposition to the selection and further publication in the "Star of the Cape" of the laws of that year; and that the agreement to share the net profits of such publication was then and there expressly ratified and continued both by respondent and appellants; and that the respondent having so withdrawn his newspaper from any contest for the selection, there being no other eligible newspaper in the county, the "Star of the Cape" was again selected to publish the laws; that the appellants received compensation therefor; that the expenses of such publication were small, the profits considerable; and the respondent prays an accounting of the profits and payment to himself of his one-half part of the net profits in accordance with the agreement.

These are substantially the facts as shown by bill, answer and proofs.

The vice-chancellor, upon the pleadings and proofs, in an oral opinion, determined that the respondent was entitled to recover on the agreement; that there had been a rivalry between them, existing for years; that the agreement of March 8th, 1890, was a truce between them; that the construction to be given to the agreement was, that for the two succeeding years mentioned therein, whichever procured the designation for the publication of the laws should perform the work of printing and divide the net proceeds; that under the evidence this agreement continued without abrogation during the publication of the laws of 1890 and 1891, and that the agreement was still in force in the year 1891; that if the respondent was entitled to anything under it, he was entitled, the same for the year 1891 as for the year 1890, and held that the court had jurisdiction of the matter in controversy, and decreed that the respondent was entitled to the relief prayed in the bill of complaint, and referred the matter to a master for an accounting between the appellants and respondent, "to report what, upon such accounting, appears to be due from each party to the other, and also the balance which, upon the said account, shall appear to be due from each party to the other."

From the record, it is rather obscure upon what grounds the case was discussed in the court of chancery.

The appellants on this appeal now contend that this agreement was in contravention of the statute on this subject-matter; that it was intended to influence and control the official action of the body having the power and duty to select the newspapers to publish the laws, regardless of the provisions of the statute having reference to the publication in the newspaper of the larger circulation, and regardless of the public benefit to be derived from this provision of the statute, and, therefore, contrary to the provisions and policy of the statute requiring such publication, and contrary to sound public policy, and, therefore, void.

It is not difficult to interpret the statute.

It is a fundamental requisite that the laws be notified to the people who are to obey them, and the object of the statute is to prescribe the method of this notification, and whatever way is made use of, it is incumbent upon "the promulgators to do it in the most public and perspicuous manner." *1 Bl. Com. 44.*

The public benefit intended by the statutes can only be obtained by the publication in the manner required by the statute, in the newspapers to be selected in accordance with the provisions of the statute, "having reference also to such of them as have the larger circulation."

In this case a due regard of the public welfare required that the governor, comptroller and treasurer should select the newspapers for the publication of the enactments of the legislature "having reference also to such of them as have the largest circulation."

This was the policy of the law, and it is important to ascertain in what manner, if at all, that agreement contravened this policy of the statute.

The nature and object of this contract or agreement between the proprietors of these newspapers are perhaps best stated by the evidence in the case about which there appears to be no dispute.

It is clear upon the evidence that between the proprietors of these newspapers there had existed for a number of years a sharp contest in relation to the question which newspaper should be

selected to publish the laws enacted by the legislature from year to year.   This contest was carried on with much feeling on both sides, and with alternating success, one or the other always being selected.

It is quite clear that this contention grew very embarrassing to themselves and exceedingly annoying, both to the two representatives in the legislature as well as to the members of the body having the power to make the selection.

Both claimed to have the larger circulation.   There existed a "bitter contest" over the subject and a constant pressure on the public officials in relation to it.

It is conceded here that both these newspapers belonged to one of the two leading political parties in the county of Cape May.

It is clear under the evidence that this agreement controlled the selection.

Had there been no agreement neither might have been selected, as there is evidence that there was another newspaper in the county seeking the patronage.

The evidence of Mr. Cole, which is not denied but conceded to be a truthful statement of the transaction, shows that the agreement alone caused the selection to be made as it was made.

There is no difficulty whatever in asserting that, so far as appears on the face of this matter, taking the contract along with the evidence, regardless of the question which newspaper possessed the larger circulation, the agreement for a financial consideration between the parties solely influenced the selection made.

The withdrawal of the one party under this agreement, to allay the antagonism and divide the profits, secured absolutely the appointment of the other to this office or patronage.

The contract not being fulfilled between the parties, the question arises, Can it be enforced, or is it so manifestly contrary to public policy, in contravention of the statute, and so injurious to the public good, that it defeats itself?

In determining this there must be kept in view the general rule of law that, where there is no statutory prohibition, the law will not readily pronounce an agreement invalid on the ground of policy or convenience, but is, on the contrary, inclined to leave

men free to regulate their affairs as they think proper. Where, however, a contract is of such a nature that it cannot be carried into execution without reaching beyond the parties and exercising an injurious influence over the community at large, everyone has an interest in its suppression and it will be pronounced void from a due regard to the public welfare. *Fuller* v. *Dame, 18 Pick. 472; Frost* v. *The Inhabitants of Belmont, 7 Allen 152, 162.*

This is the rule laid down in *Gulick* v. *Bailey et al., 5 Halst. 87.*

All contracts entered into fully and voluntarily must be held sacred and be enforced by the courts. Yet they must not be such contracts as are in contravention of the paramount principle of public good. *Egerton* v. *Earl Brownlow, 4 H. L. Cas. 235; Printing and Numerical Reg. Co.* v. *Sandford, 10 Eq. R. 462; Hinman* v. *Neeman, 12 Pac. Rep. 144.*

The principle upon which the courts of justice must go is to enforce the performance of contracts not injurious to society, and it would be absurd to say that a court of justice shall be bound to enforce contracts injurious to and against public good. *Collins* v. *Blantry, 2 Wils. 341.*

Now, the intention of the contract was to contravene the statute, and this intention is revealed in the contract. This renders the contract vicious and unenforceable. An agreement to contravene a statute in fraud of the public, or to the injury of private parties, savors of a conspiracy. An agreement contrary to public policy is likened by the authorities to a conspiracy. The viciousness of it is in the intention, and once being found to be such the law cannot presume that they are without the effect intended by the parties, in order to confer upon them the quality of enforceability.

Now, it is only upon judicial determination that a contract contravenes the policy of some public statute, or some well-known rule of law, that it is held to be void.

Turning to the judicial decisions upon this subject, we find them so numerous and of such variety that a consideration of them at any length is not practicable. The general principles governing the matter are well established by a long line of authorities, and in the case now before the court they do not appear to be of difficult application.

Brooks *v.* Cooper.

It has been declared that public policy is a variable quality, but the principles to be applied have always remained unchanged and unchangeable, and public policy is only variable in so far as the habits, capacities and opportunities of the public have become more varied and complex.  The relations of society become from time to time more complex ; statutes defining and declaring public and private rights multiply rapidly, and public policy often changes as the laws change, and therefore new applications of old principles are required.  *Davies* v. *Davies, 36 Ch. Div. 364.*

Whatever tends to injustice or oppression, restraint of liberty, restraint of legal right; whatever tends to the obstruction of justice, a violation of a statute, or the obstruction or perversion of the administration of the law; whatever tends to interfere with or control the administration of the law as to executive, legislative or other official action, whenever embodied in and made the subject of a contract, the contract is against public policy and therefore void and not susceptible of enforcement.

All contracts prejudicial to the interest of the public, such as contracts tending to prevent competition, whenever the statute or any known rule of law requires it, are void.  *1 Add. Cont. 263.*

The statute here was intended to encourage rivalry as to the matter of the circulation of the newspaper intended for selection, and the policy of the statute was the greater benefit to the public in the selection, when it declared that the matter of extent of circulation should be regarded, and any contract tending to interfere with the beneficial operation of the statute was unlawful as against the policy of the law.  *Gulick* v. *Bailey et al., 5 Halst. 87 ; Jones* v. *Randall, Cowp. 59 ; Blackford* v. *Preston, 8 T. R. 95 ; Mitchell* v. *Smith, 1 Barney 120.*  Chief-Justice Kirkpatrick, in *Sterling* v. *Sinnickson, 2 South. 756,* declared that if the consideration be against public policy it is insufficient to support the contract, and Justice Rossell, in the same case, said : " It is a general principle that all obligations for any matter operating against the public policy and the interests of the nation are void."

There are many illustrations of the application of this principle closely allied to the present case.  An agreement to withdraw an election petition in consideration of money was void.  *Coppuck*

v. *Bower*, *1 Mees. & W. 361.*   A note executed in consideration of the payee agreeing to resign a public office in favor of the maker and using his influence to appoint the latter's successor is void. *Meacham* v. *Dow*, *32 Vt. 721.*   So to the same effect upon a contract of a like nature and quality will be found the case of *Parsons* v. *Thompson*, *1 H. Bl. 322.*   A note given in consideration of forbearance of bidding at sheriff's sale of real estate was held to be without consideration, on the ground that it was the policy of the law to encourage bidding at sales on execution.   *Jones* v. *Caswell*, *3 Johns. Cas. 29.*   The policy of the law encourages free competition, and contracts in avoidance of that policy are void.   *Jones* v. *Caswell*, *3 Johns. Cas. 29 ;  Doolin* v. *Ward, 6 Johns. 194;  Thompson* v. *Davies, 13 Johns. 112 ;  Bank* v. *Sprague, 5 C. E. Gr. 160 ;  Morris* v. *Woodward, 10 C. E. Gr. 32.*   So in relation to contracts to control public officials or electors, with an illegal tendency.   *Thomas* v. *Edwards, 2 Mees. & W. 218.*   Agreements to obtain pardons.   *Hatzfield* v. *Golden, 7 Md. 273 ;  Kubben* v. *Haycroft, 26 Mo. 396 ;  State* v. *Johnson, 12 Ind. 197 ; 54 Iowa 301.*   Contracts for services known as "lobby services."   *21 Wall. (U. S.) 441.*   Contracts for moneys lent to another to aid him in securing an office.   *Meguier* v. *Corwin, 101 U. S. 108.*   Contracts for service of a canvasser at a primary election.   *Keating* v. *Hyde, 25 Mo. App. 555.*   A promise of reward for influence to secure an office.   *Nichola* v. *Mudgett, 32 Vt. 546.*   A promise to pay the director of a corporation to resign.   *Guernsey* v. *Cook, 120 Mass. 501;  Noll* v. *Drake, 28 Kan. 265 ;  Forbes* v. *McDonald, 54 Cal. 98.*   Assignment of salary not due.   *Bliss* v. *Lawrence, 58 N. Y. 442.*   The unearned half-pay of a retired army officer is not assignable. *Schwenk* v. *Wyckoff, 1 Dick. Ch. Rep. 560.*   An agreement to renounce an executorship.   *Ellicott* v. *Chamberlain, 11 Stew. Eq. 604.*   An agreement on the part of a caveator to withdraw his opposition to the laying out of a public road.   *Smith* v. *Applegate, 3 Zab. 352.*

These are instances of contracts in contravention of sound public policy, and, therefore, void.

Brooks *v.* Cooper.

Turning to those cases in which the contracts are charged to be contrary to public policy, because in contravention of the provisions of some public statute or of its policy, we find the illustrations of decided cases just as numerous and varied.

The general rule is, that all agreements or contracts, whether sealed or otherwise, in contravention of statutes, are void (*1 Add. Cont. 388 § 253, and cases cited in note 1*), and all contracts in contravention of the policy of an act of the legislature, are illegal and void. *Roger* v. *Kingston, 10 Moo. 102, 2 Bing. 441; Murray* v. *Reeves, 8 Barn. & C. 425; Hall* v. *Dyson, 16 Jur. 270, 21 L. J. Q. B. 224; Hills* v. *Mytoon, 8 Exch. 758; Cannon* v. *Cannon, 11 C. E. Gr. 316.* Contracts having for their object the violation, defeat or evasion of a statute are illegal and void (*Blasdell* v. *Towle, 120 Mass. 447*), and when the object of the contract is to obstruct duty by defeating the letter or spirit of the law, the courts will not enforce the agreement. It must not contravene the provision or policy of a public law (*Cannon* v. *Cannon, 11 C. E. Gr. 316; 9 Am. & Eng. Encycl. L. 907*), and a contract may be illegal, although not in contravention of the specific directions of a statute, if it be opposed to the general policy and intent thereof. *Staines* v. *Wainwright, 6 Bing. N. C. 174; Philpot* v. *St. George's Hospital, 6 H. L. Cas. 338; 1 Sm. Lead. Cas. pt. 1 p. 680.* It is not necessary that the statute should contain words of positive prohibition. *De Begnis* v. *Armistead, 10 Bing. 110.*

The contract here in question, between the appellants and the respondent, on its face assumes control of the disposition of the selection to publish the laws. It was not within their intention, as appears by the contract and the evidence, that either one of the members of the public body designated by law to make this selection should have the slightest voice in the performance of their duty under the statute. So far as this contract is concerned there might as well have been no existence of any such selecting power or any statute upon the subject. This contract was substituted in the place of the statute, and so far as the contract is to be considered and interpreted, the statute no longer had any force or effect. The contract was a subversion of the statute.

Regardless of the reason of the statute and the public benefit to be derived from its administration, for the purpose of allaying a personal antagonism between themselves, by their agreement, they dictated to the public body provided by law to administer this statute a course of action without reference to those provisions which designate the objects, purposes and policy of the legislature in its enactment. No grosser form of a contract in contravention of the provisions and policy of the statute could be demonstrated.

The contract itself and its tendency are the tests of its illegality. The results which are produced are not the proper tests, although here the results are those which are also interdicted by sound public policy. Its tendency was, and the result was, to influence official action regardless of the plain provisions of the statute.

In the case of *Gulick* v. *Bailey et al.*, *5 Halst. 87*, it was agreed that Bailey should give Gulick $1,000 on condition that Gulick would forbear to propose or offer himself to the postmaster-general to carry the mail on a certain mail route. There was no public auction of a contract, nor was the postmaster-general, as the case appeared, bound by statute, except, perhaps, by implication, to award the contract to the lowest bidder. He was bound to advertise for bids, and did so. Bailey and another bid in opposition to each other, and the contract was awarded to Bailey. The agreement was held void as contravening the statute of the United States and against public policy. Any contracts which have for their object the influencing the action of public officials are void as against public policy. *Ozer* v. *Hutchins, 4 Mass. 370; 1 Add. Cont. 388 § 253 note 1*. An agreement whose object or tendency is to influence any officer of the state in the performance of a legal duty, partially or completely, is void. *Lucas* v. *Allen, 80 Ky. 681; Normack* v. *Loran, Ct. App. Ky. 86; O'Hara* v. *Carpenter, 25 Mass. 410; Cator* v. *Stewart, 76 N. C. 357*. It is distinctly held that an agreement for compensation for procuring a contract from the government of our own, or that of another, country, is against public policy and void. *Tool Co.* v. *Norris, 2 Wall.*

Brooks *v.* Cooper.

(*U. S.*) *45; Oscanyon* v. *A. M. Co., 103 U. S. 261.* An agreement between two candidates for the same office, that one shall withdraw, and the other, if successful in the attempt to obtain the office, shall divide the fees with him, is void as against sound public policy. *Gray* v. *Hook, 4 N. Y. 449; Humber* v. *Wolf, 71 Pa. St. 81, 282; Osborn* v. *Williams, 81 Ves. 379; Ashburner* v. *Parish, 81 Pa. St. 52; Gordon* v. *Dalby, 30 Iowa 223.* All agreements, for financial consideration, to control or influence the business operations of the government, or the appointment of public officers, are void as against public policy, without reference to the question whether improper measures are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptations by refusing them recognition in the courts. *Tool Co.* v. *Norris, 2 Wall.* (*U. S.*) *45.* See collection of decisions in note by *Hare & W., 1 Sm. Lead. Cas. pt. 1 p. 676* &c., down to the year 1866, and a further collection of leading cases in notes to *3 Am. & Eng. Encycl. L. 875* &c. And so considerations of the same kind, of inferior moment, apply, whenever the necessary or even probable effect of the contract will be to divert any public servant from the path of duty, or cause favoritism or interest to prevail in the determination of questions which should be examined with a view to the general good and the just claims of the parties in interest. *Satterlee* v. *Jones, 3 Duer 102.*

The principles so well established by the authorities as applicable to the contract in question renders a further consideration almost superfluous. The agreement, so far as the action and intention of the parties to it is concerned, prevented the public body having power to select the newspaper from naturally entering upon any inquiry which of the two newspapers was of the larger circulation. The contract was designed for that purpose, and thus influenced that body in favor of one of the newspapers named in the contract to be selected. The selection could only be lawfully made by reference to the newspaper having the larger circulation, and the agreement appears to have been determined upon so that this body of officials should be relieved not only of the legal duty required by the statute, but that the desig-

nation or selection should be accomplished without any reference whatever to one of the distinguishing essential elements which should have entered into the selection. This agreement was intended to avoid the act of the legislature. One of the competitors retired from the competition for a financial consideration secured to him by the contract, and the contract under the evidence induced the selection made.

It is in evidence here that there was a possibility that neither paper would have been selected if this agreement had not been made; for either of them to obtain it, this settlement between them became necessary, and by this contrivance their further antagonism was avoided, and thus the beneficial operation of the statute evaded.

This statute must be presumed to have been enacted for the public benefit, and such an interpretation, if possible, should be put upon it to give it this effect, otherwise it is wholly bad, and it is the policy as well as the plain provision of the statute, that the newspaper should be selected having the larger circulation, and any contract contravening that policy is void, whatever may be the results. The statute had in view the greater publicity of the laws. The contract had in view the mere private interests of the parties to it.

Now the plan of the legislature for the selection of the newspapers gave no sanction to the contention that the selection can be made by any other body than the one designated by law to make it, or that the selection can be made by agreement between the publishers of such newspapers as may be eligible for selection, whether the purpose be to relieve the officers of the law from some embarrassing situation of a political nature or with proper or improper motives. The tendency to this result must be avoided, and, therefore, if the power of selection be vested in public officials, any agreement between those in competition for selection which in anywise has a tendency to interfere with such selection in the manner in which the selection is to be made according to the statute, for public benefit, is certainly unenforceable at law or in equity. Such candidates for selection are

to abstain from such influence and allow the selection to take its natural and legal course under the law.

The mere political right of either of the parties or the selecting power can have no consideration, except as embodied in the statute. The division of the publication between newspapers of different political parties was made that the public might be more universally reached, and so was the qualification that reference should be had to the larger circulation. The theory of the legislature was that it was for the public benefit, and not either a political or other emolument, to the newspaper selected for such publication. There was a public service to be performed, both by the body making the selection and by the persons selected, and that public service under the limitations of the statute, was the only consideration which should have been regarded.

Such an agreement as the one now under consideration must result in a detriment to the public, if the consequences be no worse. It is simply, in plain language, a financial bargain between two seekers after public position to get one or the other out of the way, so that the other may succeed in obtaining it, and it certainly comprehends within its terms the direct and positive interference with the ordinary and just administration of the law by those whose duty it was to subserve the public good in the execution of the law, and it must be held illegal and void because contrary to both the provisions and policy of the statute, and as tending improperly to influence official action. These arrangements are not interpreted and enforced by mere final results, when by their terms it seems that they are injurious to the public good. We might just as well argue that bribery of the legislator is justifiable, because the law enacted by his vote is beneficial in its character. Public laws cannot be contravened by contracts of this character, and courts must refuse to enforce their consideration, and the principles of law are salutary which compel the courts to such refusal. Neither a court of equity nor of law must be allowed to enforce contracts which are opposed to maxims of sound policy. The court will not aid either party

to an illegal contract, but will leave the parties where it finds them.

The decree of the court of chancery must be reversed.

*For reversal*—THE CHIEF-JUSTICE, DEPUE, DIXON, GARRISON, MAGIE, REED, ABBETT, VAN SYCKEL, LIPPINCOTT, BOGERT, BROWN, SMITH—12.

*For affirmance*—None.